**MAPCO INTERNATIONAL INC., Plaintiff,**

**v.**

**FEDERAL ENERGY REGULATORY COMM., et al., Defendants.**

**Civ. A. No. 91–0769.**

United States District Court, District of Columbia.

Jan. 30, 1992.

Jerry E. Rothrock, James P. Denvir, Charles A. Moore, Akin Gump Hauer & Feld, Washington, D.C., for plaintiff.

Don W. Crockett, Richard F. Ahern, Judicial Litigation Div., Economic Regulatory Admin., U.S. Dept. of Energy, Washington, D.C., for defendants.

## MEMORANDUM OPINION

SPORKIN, District Judge.

### I. Introduction

This action involves the enforcement of the so-called "layering rule," 10 C.F.R. § 212.186,[1] governing the resale of crude oil. MAPCO is a reseller of crude oil. In April of 1986, the Department of Energy issued a remedial order charging MAPCO with violations of the layering rule and ordering it to repay $1,765,320.59 in overcharges. MAPCO brought this action seeking to have the enforcement case remanded to the Federal Energy Regulatory Commission (FERC) with orders that the Commission consider whether the layering rule was validly adopted. In the alternative MAPCO seeks to have the remedial order vacated as arbitrary and capricious and based on an erroneous interpretation of the regulation.

This action was filed on April 11, 1991. In August the plaintiff filed a motion for partial summary judgment. It briefed only the issue of whether FERC is required to consider the legality of the layering rule. The defendants countered by requesting that this Court proceed with full summary judgment on all the issues raised in the case including the substantive merit of the remedial order. In order to avoid any further delay, the Court decided to address all issues including the procedural validity of the layering rule as well as the substantive merit of the remedial order and directed the parties to proceed with their cross motions for full summary judgment.[2] A hearing was held on the motions on November 22, 1991. The Court has carefully re-

---

1. The text of the rule is as follows:

10 C.F.R. § 212.186 **Layering**
The price for crude oil charged by a reseller which in a sale performs no service or other function traditionally and historically associated with the resale of crude oil shall not exceed the actual price paid by the reseller for the crude oil, less any amount received in an exchange and any amount received in excess of the amount paid in a matching purchase and sale transaction having the same effect as an exchange, plus any amount paid in an exchange and any amount paid in excess of the amount received in a matching purchase

and sale transaction having the same effect as an exchange.

2. FERC takes the position that it does not have jurisdiction over questions of the substantive validity of rules adopted by the Department of Energy. As a result, it has refused to pass on plaintiff's contention that the rule is invalid. Without determining the validity of this position other than to recognize that FERC certainly has a foundation for its view, the Court believes that it certainly has the right to consider the validity issue regardless of whether FERC has made a prior determination. For this reason, the Court has decided this question.

viewed the arguments of both sides and believes that there is no genuine issue of material fact left in dispute. Hence, the case is appropriate for summary judgment, and the Court is now prepared to decide it.

The Court has granted the United States' motion seeking to intervene. Hence there are now three defendants in the case: the Department of Energy, FERC and the United States.

## II. Factual Background

### A. *Evolution of the Layering Regulation*

During the 1970's, the sale and pricing of oil was strictly regulated. At issue in this case are those regulations which governed "resales" of crude oil, that is sales made after the initial sale by the crude oil producer. In October of 1976, the Federal Energy Administration (predecessor to the Department of Energy) issued a Notice of Proposed Rulemaking in the Federal Register entitled "Clarifications to Mandatory Petroleum Price Regulations Applicable to the Resale of Crude Oil." 41 Fed.Reg. 47077 (October 27, 1976). The notice stated:

> application [of petroleum pricing regulations] to crude oil resellers has raised interpretive questions because of certain significant respects in which the historic business methods of crude oil resellers differ from those generally employed by resellers of other covered products.... These factors have led [the Federal Energy Administration] to consider whether some clarification and/or modification of [the pricing regulations] is appropriate to recognize the unique nature of crude oil reselling. 41 Fed.Reg. 47078 (October 27, 1976).

The notice provided proposed regulatory interpretations, invited written comments, and scheduled public hearings. It did not address the practice of "layering" directly, but it did give a detailed description of the traditional and historical practices in the resale industry. Specifically, it said,

FEA understand that crude oil resellers began to enter the marketplace in the late 1940's and early 1950's in response to the need of such producers to move small and/or inconveniently located volumes of crude oil to the major pipelines. Thus, resellers have tended to serve the needs of this segment of the producing industry by accumulating production from a number of small leases so as to be able to market sufficiently large volumes to attract the refiners' buying interest, and by transporting crude oil by truck or other method from leases inaccessible to the pipelines. The purchase and resale of crude oil by such firms appears to be an important historical element in the crude oil distribution chain.

In August of 1977, the FEA issued a further Notice of Proposed Rulemaking. *See* 42 Fed.Reg. 41257 (August 15, 1977). This notice stated that FEA believed it needed further comments before it issued final regulations. Hence, this notice offered "proposed specific regulatory amendments," *id.*, and indicated that after further comments were received, a final formal ruling would be issued.

In this notice, the FEA addressed the issue of layering directly. It stated,

> FEA seeks to ensure that the price regulations do not permit abuses by crude oil resellers. Of particular concern to FEA is the practice commonly known as 'layering': the insertion of one or more "resellers" between the producer and refiner and the charging of one or more markups, where the 'layering' firm performs no service or other function traditionally and historically associated with the resale of crude oil. To this extent, FEA will consider the adoption of regulatory amendments and interpretive rulings to make it clear that such practices are not permitted under the Mandatory Petroleum Allocation and Price Regulations. 42 Fed.Reg. at 41262.

The notice again invited written comments and scheduled a public hearing.

In December of 1977, the Department of Energy[3] issued its final rule. In the

---

**3.** The Federal Energy Administration was trans- ferred to the Department of Energy on October

preamble, the Department stated the following:

> FEA solicited comments on whether regulatory amendments or interpretive rulings were necessary to make it clear that the practice known as 'layering' described in the August 9 Notice, is not permitted under the price regulations. Several of the comments opposed a special rule on layering on the grounds that (1) the existing regulations make it clear that layering is prohibited; (2) competition among resellers is sufficiently strong to inhibit layering; and (3) an express provision regarding layering may interfere with crude oil exchanges between resellers. However, a relatively large number of comments offered proposals to restrict layering, and information available to [the Department] indicates that there may be a significant number of instances of layering. Accordingly, the rule adopted today includes a provision which is intended to discourage layering but which should not interfere with normal transactions among resellers. 42 Fed.Reg. 64859 (December 29, 1977).

The text of the final rule is given in footnote 1. The dispute in this case arises out of the Department of Energy's enforcement of this rule against MAPCO.

### B. *MAPCO's Activities*

In its own words, MAPCO says that in the late 1970's, it "frequently resold crude oil in various transactions in which the company did not take physical possession of the crude oil by transporting, gathering or storing the crude oil." Plaintiff MAPCO's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment at 4. It confirmed this position in open court when counsel stated "we performed no gathering, storage or transportation. That is absolutely true." Transcript of Hearing, November 22, 1991, at 62.

The Department of Energy reviewed MAPCO's books and found 105 questionable crude oil resale transactions. *See* Transcript at 45. MAPCO agrees that there are 105 transactions in question. *See* Transcript at 65. A party would sell MAPCO title to thousands of barrels of crude oil as they passed a particular point in a pipeline. Almost instantaneously MAPCO would transfer title to another party, receiving a mark-up in price even though it performed no services. The same oil that was bought and sold by MAPCO was the subject of multiple purchases and sales as it made its way from the pipeline entrance to the refinery. In all 105 transactions, MAPCO bought from another crude oil reseller and sold to another crude oil reseller. In none of the transactions did MAPCO buy from an oil producer or sell to an oil refiner. *See* Transcript at 70.[4] The Department of Energy believed that MAPCO's activities were exactly the type of conduct the layering rule prohibited. MAPCO did not accumulate small volumes of oil nor did it transport oil from inconvenient locations as did the traditional resellers described in the 1976 NPRM. Consequently, the Department proceeded to enforce the rule against MAPCO.

### C. *The Enforcement Action*

On April 21, 1986, the Department of Energy issued a Remedial Order to MAPCO International, charging it with violations of the layering rule, 10 C.F.R. § 212.-186, and directing it to refund to the Department $1,765,320.59, plus interest.[5] The remedial order charged that MAPCO had bought and sold crude oil as it moved

---

1, 1977 by Public Law 95–91 and Executive Order No. 12009 (42 Fed.Reg. 46267, September 15, 1977).

**4.** The Department determined that some of the chains were made up of more than 50 firms. In one such chain, three firms who owned the oil before MAPCO bought it owned the oil for a second time after MAPCO sold it and before it reached the refinery. Defendants' Appendix to

Their Memorandum of Points and Authorities in Support of Their Cross Motion for Summary Judgment, Exhibit A, 86, 161, n. 12 (Text of the Remedial Order Issued April 21, 1986).

**5.** The Remedial Order upheld a Proposed Remedial Order issued on June 30, 1983 by the Economic Regulatory Administration within the Department of Energy.

through the pipeline without ever taking physical possession of it, putting it in the pipeline, taking it out of the pipeline, or paying for its transportation or storage. The Department of Energy concluded that these activities were prohibited by the layering rule because they were not "traditional and historical functions" associated with the resale of crude oil.

MAPCO appealed the Department's decision to FERC arguing primarily that the layering rule was procedurally invalid, i.e. that it had been promulgated contrary to the requirements of the Federal Energy Administration Act. FERC refused to take jurisdiction over the issue of the legality of the layering rule.[6] It did, though, affirm the Remedial Order on July 17, 1991. Plaintiff then filed this lawsuit claiming that

(a) the layering rule had been illegally promulgated;

(b) the Department's interpretation of the rule was incorrect;

(c) MAPCO had obeyed the rule as correctly interpreted; and

(d) MAPCO was denied due process in its efforts to challenge enforcement of the rule.

## II. Legal Issues

The plaintiff and the defendant interpret the phrase in the regulation "service or function traditionally and historically associated with the resale of crude oil" differently. The meaning of this phrase under the circumstances of this case is a question of law not a question of fact as plaintiff contends. The language is taken directly from the regulation as promulgated, *see* footnote 1. The regulation itself was a clarification and interpretation of existing petroleum pricing regulations as applied to the resale of crude oil. It is the agency's responsibility to interpret these words so that it can enforce them. The agency has offered a reasonable and consistent interpretation, and in accordance with the rele-

vant legal standards, the Court will uphold the agency's interpretation.

### A. *Promulgation of the Layering Rule*

 The layering rule is procedurally valid. Whether it is viewed as an interpretive rule to which the notice and comment requirements do not apply or as a full-fledged legislative rule, the Department of Energy has met all applicable legal standards for promulgating a valid regulation.

The requirements for rulemaking under the Federal Energy Administration Act (FEAA) are set forth at 15 U.S.C. § 766(i). They incorporate by reference the requirements of the Administrative Procedure Act, 5 U.S.C. §§ 551–559. Under these statutes, the agency may issue interpretive rules without first soliciting notice and comment, *see* 5 U.S.C. § 553(b)(A), however, the public must be given notice and an opportunity to comment when a government agency seeks to promulgate a new substantive rule. *See* 5 U.S.C. § 553(b) and (c).

The layering rule is an interpretive rule. The preamble to the regulations themselves states that FEA initiated the rulemaking process to determine "whether regulatory amendments or interpretive rulings were necessary to make it clear that the practice known as 'layering' described in the August 9 Notice is not permitted under the price regulations." 42 Fed.Reg. 64859. The notice included the word "clarification" in its title. The agency intended to give further interpretation and elucidation to an existing prohibition, not to create a new one. The agency succeeded in its objective and through its interpretation made it clear that "layering" was prohibited.

The defendants also correctly maintain that the layering rule was properly adopted under the applicable FEAA and APA rulemaking requirements for non-interpretive rules. As the Court mentioned to the parties at the hearing on summary judgment, plaintiff is really making a deviation claim,

---

**6.** The plaintiff requested the Court in this action to remand the question of the rule's legality to FERC with an order that the Commission take jurisdiction and decide the issue. The Court refused to do this and instead ordered the parties to proceed with their cross motions for summary judgment. *See* Order, Civil Action No. 91–0769, October 3, 1991.

*see* Transcript at 14, 53, rather than a claim of total lack of notice and comment. The notice and comment procedures that the Department of Energy conducted in connection with the layering rule clearly met the requirements for administrative rulemaking.

The standards for determining what constitute legally sufficient notice are flexible. "An agency need not publish in advance every precise proposal it may ultimately promulgate as a rule.... Notice ... is sufficient if it affords interested parties a reasonable and meaningful opportunity to participate in the rulemaking process." *McCulloch Gas Processing v. Department of Energy,* 650 F.2d 1216 (Temp.Em.Ct.App.1981). Only where the initial proposal and the final rule vary greatly, as they did in *Shell Oil Co. v. Federal Energy Administration,* 574 F.2d 512 (Temp.Em.Ct.App.1978), must the agency publish a new notice of proposed rulemaking. In that case, the Temporary Emergency Court of Appeals held that the agency had not given sufficient notice when it published one formula for calculating unleaded gasoline prices in its June interim rule and then adopted an altogether different formula in its July final rule. In this case, the Department of Energy gave a description of what constituted traditional reseller practices in its October 1976 notice. It then gave a specific definition of prohibited "layering" in its August 1977 notice. Finally, it adopted a rule which incorporated almost identical language to that used in the August notice and used the preamble to state that the rule on which it accepted comments was the rule it was promulgating. Plaintiff had plenty of notice and opportunity to comment on the layering rule. The Department clearly met all the requirements imposed by the Federal Energy Administration Act and produced a procedurally valid rule.

B. *Interpretation of the Layering Rule*

 Where a regulation is unclear or in doubt, "the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erro-neous or inconsistent with the regulation." *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945) *cited in Pennzoil Co. v. United States Department of Energy,* 680 F.2d 156 (Temp.Em.Ct.App.1982); *UPG, Inc. v. Edwards,* 647 F.2d 147, 157 n. 26 (Temp. Em.Ct.App.1981). *See also Thriftway Co. v. United States Department of Energy,* 920 F.2d 23, 26 (Temp.Em.Ct.App.1990) (Using identical language with different citation). In rare circumstances where personnel have offered differing interpretations of the same rule, the same degree of deference may not be used, *see Standard Oil Co. v. Department of Energy,* 596 F.2d 1029 (Em.App.1978), but the Temporary Emergency Court of Appeals has explicitly stated, on multiple occasions, that *Standard Oil* has very limited application. *See Pennzoil v. U.S. Dept. of Energy,* 680 F.2d at 174, n. 29.; *UPG, Inc. v. Edwards,* 647 F.2d 147, 157, n. 26. (Temp.Em.Ct.App. 1981) ("it was only by reason of the extraordinary circumstances of *Standard Oil* that an adequate basis for according deference was not found.") Deference to the agency is the rule, and adoption of a differing—and often self-serving—interpretation offered by the regulated party is the exception.

MAPCO's contention that the layering rule is not entirely clear on its face is without merit. The meaning of the phrase "service or other function traditionally and historically associated with the resale of crude oil" when taken in the context carefully developed by the Department of Energy in its notice and comment proceeding, is apparent. *See Thriftway Co. v. United States Department of Energy,* 920 F.2d 23, 26 (Temp.Em.Ct.App.1990) (Intent of agency is factor to consider when construing regulation) *citing In re Department of Energy Stripper Well Exemption Litigation,* 690 F.2d 1375 (Temp.Em.Ct.App.1982). The Department of Energy has made it clear which "resales" of crude oil are not permitted under this regulation. Thus resales of crude oil which include services that add economic

value to the transaction, services like the transportation and storage mentioned in the original October 1976 notice, are permitted. *See* Defendants' Memorandum of Points and Authorities In Support of Its Motion for Summary Judgment at 27–28. Where such attendant services are not involved in the resale process, then impermissible layering has occurred. Plaintiff has failed to show that the Department of Energy's interpretation is either clearly erroneous or inconsistent with the agency's regulation.

The plaintiff argues that the transactions which the Department has found to be violations have occurred over many years in the crude oil resale industry. Plaintiff contends that its activities were of the "traditional and historical" sort permitted under the layering rule.

The interpretation offered by the plaintiff is implausible. The regulation was adopted to make it absolutely clear that certain reselling activities which were known to be ongoing in the crude oil resale industry were prohibited. Plaintiff wishes to interpret the phrase "traditional and historical" as meaning any activity that has "regularly" occurred in the past. *See* Transcript at 27–28; Plaintiff MAPCO International's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment at 29–30 (phrase means "any function or any service that was performed by a crude oil reseller in resales that occurred prior to the advent of price controls in 1973.") It would be illogical for the Department to write a regulation that would legalize all conduct that had previously occurred when its very purpose was to eliminate prior abusive activities. The Temporary Emergency Court of Appeals reached the same conclusion in *Thriftway* where it rejected an interpretation of the small refiner bias entitlement regulations that would have allowed a large refinery to benefit from the program by arranging a paper transaction with a small refiner for oil that was already in transit from the producer to the large refinery. The court stated, "We reject Thriftway's interpretation because it would allow the abuse that the rule was promul-

gated to prevent." 920 F.2d at 26. The Department of Energy has given a legally valid interpretation of its layering regulation. FERC has acted properly by upholding that interpretation.

### C. *Compliance with the Layering Regulation*

■ In a final attempt to defend its activities, plaintiff argues that even under the Department's interpretation of the regulation, its resale transactions were permissible because they did add economic value. Plaintiff has already admitted that it did not take physical possession of the oil, let alone store it or transport it. And though plaintiff argues that it was in compliance, it has failed to introduce any evidence to demonstrate that it did add economic value to the resales it effected. Plaintiff has attached to its Opposition to Defendants' Motion for Summary Judgment the affidavit of Dr. Robert Hermes, dated November 13, 1991. This affidavit was filed more than eight years after issuance of the proposed remedial order in this case. When asked at the hearing on summary judgment what it could offer to controvert defendants' contention that it violated the layering rule, plaintiff pointed to Dr. Hermes' statement. Because the affidavit was not a part of the administrative record, the Court may only review this document for a limited purpose. Plaintiff has proffered it only as an example of what it might show in a remanded hearing. The affidavit is not persuasive. While it does discuss the need to have resellers to balance out supply and demand in the crude oil market, it talks repeatedly and exclusively about the functions resellers play vis a vis buyers and sellers of crude oil, meaning refineries and oil producers. Since plaintiff in the 105 disputed transactions never bought oil from an oil producer or sold crude oil to a crude oil refiner, Dr. Hermes' statement is simply not relevant to the facts or allegations in this case.

Plaintiff is really offering Dr. Hermes' affidavit to again contest the interpretation of the regulation. The defendants have consistently maintained, from the inception

of the rulemaking proceeding, that the acceptable services and functions traditionally and historically associated with the resale of crude oil are ones like transportation and storage, those that add economic value to the transaction. Dr. Hermes' affidavit actually confirms that interpretation since he notes that serving as a middleman between an oil producer and an oil refiner serves an economic function. Much as plaintiff may plead to the contrary, the affidavit does not create a genuine issue as to whether resales between resellers, which plaintiff openly admits comprise all 105 transactions, add economic value to crude oil transactions.

### D. *Due Process Considerations*

■ Plaintiff's last argument is that it was denied discovery and a hearing once it sought to oppose the Remedial Order. There is no factual or legal basis for this argument. Discovery is given during litigation, but it is not a part of an administrative enforcement proceeding like the one that is the subject of this action. Plaintiff was entitled to a hearing, and it received not just one, but two. *See* Certified Administrative Record of Enforcement Proceeding, 149–256 and 623–691. It got a hearing before the Department of Energy Office of Hearings and Appeals in 1985 and another hearing before the Federal Energy Regulatory Commission in 1988. Both of these were administrative hearings, on the record, where plaintiff was given the opportunity to respond to the defendants' charges. Briefs were filed, and an extensive paper record was developed as well. Plaintiff acknowledges that it did not introduce affidavits like the one from Dr. Hermes into the administrative record. Instead plaintiff offered affidavits of company employees, documents which plaintiff

itself called "self-serving." Transcript at 33.

At the 1985 administrative hearing, counsel for plaintiff was asked which affidavits in the record placed facts in controversy. Counsel pointed to a letter and an affidavit from David A. Roach, an employee of MAPCO, which had been submitted to the agency. *See* Certified Record at 250–252. Those same documents have been submitted to the Court as exhibits. The affidavit, *see* Exhibit C, Plaintiff's Statement of Facts in Material Dispute, does not even discuss the alleged layering violations. It only discusses foreign crude oil resales. The letter, *see* Exhibit B, Plaintiff's Statement of Facts in Material Dispute, says the following:

> MAPCO International is prepared to document the fact that the transactions it performed were those traditionally and historically associated with the resale of crude oil.

If the plaintiff was prepared to document that fact, then it should have done so. It has not.

Plaintiff's real objection is not that it did not get a hearing, but rather that it did not get a chance to cross-examine the agency personnel who determined that there was a violation of the layering rule. In these administrative proceedings, where the agency has produced a record of uncontested facts that overwhelmingly supports the allegations of wrongdoing, at a minimum plaintiff must challenge the agency with its own supported statement of facts. The proceeding in question was a civil not a criminal action. Unless plaintiff can legitimately contest defendant's facts, there is no need for an extended hearing. Without a proper challenge, the record is presented to the administrative body as if for summary judgment.[7] In this case, the facts presented by the Department of Energy

---

7. The same principle applies here as in summary judgment before a court. Under the Federal Rules of Civil Procedure, summary judgment may be granted to the moving party if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary

judgment as a matter of law. Fed.R.Civ.P. 56(c).

To establish that there is a genuine issue of material fact in dispute, it is not enough for a party to deny factual allegations. It must make its own affirmative statements of fact. *See Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

went unchallenged. Plaintiff could have offered affidavits to contest the Department of Energy's case. It chose not to and now cannot be heard to complain that it has been deprived of the right to a full hearing.

When asked at the hearing on summary judgment what facts it would have disputed had it been allowed those rights attendant to a full evidentiary hearing, plaintiff answered that the "critical facts" were whether plaintiff's resale services were "traditional and historical." Transcript at 40. Plaintiff offered no factual evidence on its part and has treated the issue as a legal question.

Plaintiff now belatedly claims that it has facts that would show its resales did add economic value to its transactions. Plaintiff claims it did not place Dr. Hermes' affidavit or similar evidence into the record on a timely basis because it did not understand defendants' interpretation of the regulation until after the proposed remedial order was issued and *P & R Trading Co.*, 13 DOE ¶ 83.023 (1985) was decided.[8] Transcript at 41–42. The Court rejects plaintiff's position. A litigant simply cannot hold back in prosecuting its case and then claim once it has moved far down the litigation road, that it has not been given a fair chance to argue its position. Due process of law does not require that a party be given two bites at the litigation apple.

Conclusion

Plaintiff has made a very technical argument that is not born out in law or fact. At bottom, it objects to the defendants' interpretation of the layering rule because it does not like its consequences. It has failed to put into dispute any of the facts that were the basis for the Department of Energy's original remedial order. Defendants have satisfied the standard of review. *See Pratt v. Watkins*, 946 F.2d 907 (Temp.Em.Ct.App.1991) (Court reverses FERC remedial order only where it is in excess of agency authority or not supported by substantial evidence). They have shown that there was substantial evidence to support their actions. Accordingly, the decision of the Federal Energy Regulatory Commission upholding the remedial order is affirmed.

---

**8.** Plaintiff takes the position that defendants did not articulate their interpretation of the layering rule until they issued the *P & R Trading Co.* decision in 1985.